# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ALEX ABOU-HUSSEIN, | x | |
| Plaintiff, | x | |
| -against- | x | **COMPLAINT** |
| RAY MABUS, Secretary; United States Department of Navy; and | x | |
| UNKNOWN NCIS AGENTS, United States Department of Navy, | x | **JURY TRIAL DEMANDED** |
| Defendants. | x | |

## PRELIMINARY STATEMENT

1.      This is a civil action in which the plaintiff, ALEX ABOU-HUSSEIN (hereinafter referred to as "Abou-Hussein" or "Plaintiff"), a current employee of the Department of Navy (hereinafter referred to as the "DON" or the "Agency"), seeks relief for violations of his rights secured by Title VII of the 1964 Civil Rights Act, 42 U.S.C. §2000e et seq., as a result of discrimination in the terms and conditions of his employment by the DON on the basis of his national origin; for retaliation with espionage and terrorism allegations to hinder a Qui Tam relator providing law enforcement officers with information relating to the commission of Federal offenses in violation of 18 U.S.C.; and for his filing a Freedom of Information Act ("FOIA") lawsuit seeking to inform the taxpayers of the Unit Prices and Subcontractors' identities of his DON employer.

The plaintiff seeks an Order to Department Of Justice ("DOJ") Office of Information Policy ("OIP") to publish an update on OIP website that DOJ has recently litigated the *Fundamental Question* as written by Honorable Merrick Garland: "We have never decided that **Fundamental Question**, however, because the government has never litigated whether such prices are subject to those statutes",

*McDonnell Douglas Corp. v. USAF*, 375 F. 3d 1182, C.A.D.C., 2004.

The plaintiff also seeks damages, both compensatory and punitive, affirmative, declaratory, and equitable relief, an award of costs, and such other and further relief, as this Court deems just and equitable.

## JURISDICTION

2.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§1331, 1343(3), this being an action seeking redress for violation of the plaintiff's constitutional and civil rights.

3.      Plaintiff's claim for declaratory and injunctive relief is authorized by 28 U.S.C. §2201 and 2202, Rule 57 of the Federal Rules of Civil Procedure, the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq., the Whistleblower Protection Act ("WPA"), the Notification and Federal Employee Anti–Discrimination and Retaliation Act ("No FEAR Act"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and the retaliation provisions of the False Claims Act ("FCA").  Plaintiff argues his is a case of first impression, of a federal employee whistleblower accused of foreign espionage and plotting a terrorist attack and seeks declaratory relief as a Bivens claim.

4.      The plaintiff demands a trial by jury on each and every one of his claims.

## VENUE

5.      Venue is proper for the United States District Court for the District of Columbia pursuant to 29 U.S.C. §621 et seq., and 28 U.S.C. §§1391 (a), (b) and (c).

## EXHAUSTION

6.      RICO and FCA retaliation cases do not require exhaustion.  Nonetheless, upon the advice of FBI Agent Robert Derr in April 2008, plaintiff filed a fraud complaint in May 2008 with the Office of Special Counsel ("OSC") Disclosure Unit, alleging defense contract fraud within his employing organization in a wargame project staffed by SAIC, a defense contractor, and the retaliation

directed against him for disclosing the fraud internally.  OSC asked plaintiff to submit to OSC the SAIC pillar contract document itself, which plaintiff did not have, so OSC closed the complaint.

7.     On November 17, 2008, Naval Criminal Investigative Services ("NCIS") agents opened investigation of plaintiff with recycled allegations of foreign espionage on roadside bombs' electronic defenses and other alleged criminal activity.  NCIS reported to defendant's immediate subordinate, Anne Brennan, then-acting General Counsel of the Navy.  Plaintiff countered the NCIS investigation by filing a FOIA request for the release of the SAIC contract that OSC asked for.

8.     During 2009-2011, plaintiff repeatedly filed Mixed-Case appeals with the Merit Systems Protection Board ("MSPB" or "Board"), filed multiple complaints with Office of Special Counsel ("OSC") and Department of Defense Inspector General ("DODIG"), alleging contract fraud, conspiracy, death threats, and retaliatory discrimination on account of his Arab origin and in retaliation for his whistleblowing.  Agency officials further retaliated for plaintiff's multiple complaints in a concerted conspiracy with allegations of plaintiff's potential carrying over of a terrorist shooting attack on his Navy base because of mental instability like the Ft. Hood massacre that occurred weeks later.

9.     On August 26, 2009, only two days after seal was leaked of Abou-Hussein's Qui Tam action against SAIC, defendant's anti-terrorism officer and plaintiff's commanding officer suspended plaintiff's security clearance then referred him to Navy mental clinic to forestall the alleged terrorist attack.  Plaintiff repeatedly contacted OSC for relief, and finally had a lengthy conversation with the OSC supervisor, Bernard Cabel, who told plaintiff on the phone literally "*No one can help you now.*"

10.    On September 23, 2009, OSC's Prohibited Personnel Practices ("PPP") closure letter to plaintiff wrote: "*terrorism allegations do not constitute a hostile work environment as recognized by statute…hence we are closing your file.*"  Plaintiff then appealed again to the Board.  On July 14, 2010, Board convened a hearing in Charleston, SC, after refusing to take under jurisdiction on any claim

3

related to espionage, terrorism, mental disorder, or substance abuse. Board's attorney examiner, Alexander Thompson, advised plaintiff to drop his retaliatory discrimination claim during the acrimonious recorded Pre-Hearing Conference on July 9, 2010; plaintiff refused to drop the discrimination claim.

11. In November 2010, House Oversight and Government Reform ("OGR") Committee made a formal inquiry to MSPB IG after he had refused to issue a tracking number to a complaint filed by plaintiff against Thompson for destroying the evidentiary record in violation of 18 U.S.C. §2071. MSPB IG, James Eisenmann, reluctantly issued the complaint number, 11-01, and promised preliminary Report of Investigation ("ROI") in 2 weeks; however, no ROI has been sent to plaintiff to date despite repeated requests.

12. In December 2010, Thompson issued a 31-page initial decision denying appeal without a single mention of the discrimination claim, or the core claims of conspiracy with espionage and terrorism allegations, referring plaintiff to a military mental clinic, and accusing him of substance abuse.

13. On April 4, 2012, nearly 3 years after the protracted administrative process started with plaintiff's first MSPB appeal on April 20, 2009, the belated final Board order declined to take jurisdiction on the discrimination claim. This original complaint is filed within the named 65 days in the MSPB order directing plaintiff to file in the Federal Circuit, which recently has ruled it lacks jurisdiction over discrimination claims in similar "mixed cases", _Diggs v. HUD_, 670 F.3d 1353, C.A.Fed., 2011.

Thus, the Board misdirected plaintiff to the wrong venue, and did not give this pro se plaintiff any direction on where to file. Moreover, the evidentiary record at the Board is spoliated, and plaintiff brings this case of first impression mainly as a _Bivens_ claim not seeking monetary damages pursuant to Justice Alito's elaborate jurisprudence in _Mitchum v. Hurt_. 73 F.3d 30, C.A.3, 1995. Abou-Hussein's main prayer for relief is an Order to DOJ OIP to publish an update to Judge Garland's Jurisprudence.

**PARTIES**

14.     The Plaintiff, HAMDY "ALEX" ABOU-HUSSEIN, is a naturalized US citizen and resident of the United States, is not a citizen of any foreign country, and is currently a resident of the County of Charleston, State of South Carolina. Plaintiff, a male of Arab Egyptian descent, first came to the United States in 1988, received a B.S. in 1989 from Alexandria University, trained in Woods Hole Oceanographic Institution, received his Masters in Engineering from Boston University in 2001, then began work as a Marine Engineer for Northrop Grumman Corporation in 2002, had a short work stint in the Iraq war theatre where he made a significant patriotic contribution before joining the civil service in 2005 in an accelerated DON program to graduate defense acquisition professionals.

15.     Defendant, RAY MABUS, is Secretary of Navy ("SECNAV") and in that capacity is the chief executive officer of the DON, of which the Space and Naval Warfare Systems ("SPAWAR") Command is a component. NCIS reports to DON General Counsel who reports directly to SECNAV.

**STATEMENT OF FACTS**

16.     Abou-Hussein recognizes that the following statement of facts may defy belief without evidence of precedent; this court has already partial evidence under seal in its offices from a prior litigation. If it may please the court to verify, it may locate this sealed evidence filed by United States Attorney ("USA") in 2008 on 9/11. See government exhibits in *Abou-Hussein v. Gates*, civil action 08-783-RJL, a Privacy Act suit seeking to expunge an earlier espionage record, and dismissed for failure to exhaust the administrative process. Abou-Hussein filed this suit in conjunction with his filing first fraud complaint to OSC Disclosure Unit in May 2008 in order to stop the conspirators from detaining him extra-judicially without publicity.

17.     USA exhibits are limited to earlier NCIS allegations from 2005 of plaintiff's spying on military armored vehicles and its Improvised Explosive Devices ("IEDs") Jammers bound for the US military wars.

18. Plaintiff also submitted his counter-exhibit in 2008, the EEOC settlement that included a SECNAV apology to plaintiff for these earlier espionage allegations; this exhibit was also placed under seal after USA Taylor moved to force a seal of Abou-Hussein's exhibits.

19. The dismissed suit was wrongly brought under section 1983, was filed on May 5, 2008, yet despite the apology, additional espionage and terrorism allegations were made in 2009 while plaintiff was awaiting the ruling of this very same court, so the issues of instant suit were never subject to prior litigation. Last order by Judge Lyon was handed down under seal after the US Supreme Court denied Abou-Hussein's Petition for Certiorari No.10-739.

20. USA Taylor exhibits also do not include SPAWAR false allegations that Plaintiff's Japanese American ex-wife is allegedly connected to Russian Military Intelligence ("GRU") because of her meetings with Russian officials while doing dissertation research in Russia in the 1990s before she became assistant political science professor at Harvard University. Plaintiff prays this honorable court to suspend disbelief until its review of Abou-Hussein's Russian spy exhibit to prove the extreme animus of the conspirators' clan in South Carolina from his very first day of employment.

**A.     Conspirators' Unawareness of Plaintiff's Contribution in the Iraq War and FBI Affiliation Saved Him From Another Frame-Up After Whistleblowing**

21. In February 2004, while plaintiff was employed as a Marine Engineer with Northrop Grumman Corporation ("NGC"), he was favorably adjudicated a secret level security clearance. On the very next day, when plaintiff went to his security office to update his badge, FBI agents showed up unannounced at NGC security offices for plaintiff's recruitment as an informant; plaintiff declined joining the scheme as explained, but he requested to continue FBI security vetting process to become a part-time language analyst in addition to his engineering career.

6

22. In April 2005, plaintiff work was for another defense contractor, and immediately deployed to Iraq while the FBI background investigation was proceeding state-side. In Iraq, plaintiff deployed with US Army Military Intelligence in Taji, at the heart of the Sunni insurgency. Plaintiff applied his knowledge of military remote sensors, the FBI biometrics systems, and his native understanding of middle eastern culture, to come up with a proposal to have the Sunni tribes join with the American side.

23. Plaintiff's proposal included, beside secret technical inducement black operations, a policy that fused an amnesty to insurgents with an economic census of properties; Colonel David Bishop, Taji commander, subsequently rejected plaintiff's proposal. In July 2005, plaintiff, after failing to gain support for his proposal with his correspondence to offices of Joint Chiefs of Staff ("JCS"), resigned and traveled to Arizona, where he met in August 2005 with US Senator McCain's Chief of Staff, and placed his personal proposal to turn the tide in the Iraq war in a sealed package for Honorable McCain's review.

24. In 2006, the US military began trying new tactics similar to elements of Plaintiff's proposal beside the amnesty to insurgents; namely the technical inducement black operations proposed by Abou-Hussein, which remains unknown to the public to this day. The third prong of the proposal, the economic census, meant for long term stability, was never implemented though.

25. The intermittent background investigation by the FBI lasted four years, and included full polygraph and psychological evaluations. FBI protracted investigation concluded in a favorable adjudication of a FBI Top Secret ("TS") security clearance to plaintiff in March 2008, upon Plaintiff's submittal to FBI the DON apology for the 2005 espionage allegations and EEOC settlement.

26. Plaintiff still could not collect payment as a contractor for the FBI after TS adjudication because he has become a civil servant by then, and so the FBI asked plaintiff to seek a waiver from

DON to be paid as a contractor. Plaintiff offered FBI instead to work as an unpaid volunteer, in order to keep his affiliation secret from Navy's corrupt officials then-targeting him after he made internal fraud disclosures. Those Navy officials had begun secretly compiling false sexual harassment allegations against plaintiff, and plaintiff decided he has better chances beating a spy/terrorist charge than to be framed by any white female in South Carolina. Time proved plaintiff right.

27. In March-April 2009, immediately after plaintiff appealed the denial of his FOIA request for SAIC contract to Anne Brennan, then-acting General Counsel of the Navy, the subjects of the fraud complaint who originated the SAIC wargame, Ryan Gunst, Terry Simpson, and Brian Ratliff, testified as "confidential sources" under oath of plaintiff's terrorism connections and substance abuse. Also, NCIS agents reporting to Brennan wrote false reports that Abou-Hussein is plotting a terrorist shooting attack in criminal violation of U.S.C. 18, section 1001, a RICO predicate act violation, 18 U.S.C. § 1961.

28. On May 15, 2009, 10 days after those false terrorism connection allegations were released into Plaintiff's Office of Personnel Management ("OPM") personnel records, the FBI pulled its TS clearance from plaintiff and his employment prospects and personal liberty and physical security are now injured for life, but he was spared incarceration so far, unless another major terrorist attack occurs, then he may be the first to go under the NDAA's infamous section 1021.

29. Defendant violated the Privacy Act when he instructed OPM to deny the release of the NCIS agents criminal report of 2008-09. Plaintiff focused during 2010 on PA/FOIA appeals to OPM to release the derogatory testimony of the non-agents "confidential sources", and finally OPM General Counsel, Elaine Kaplan, allowed a partial release to him, so he was able to identify the above named officials; who share the actual authorization of the fraudulent SAIC wargame award, and 100s of other awards to SAIC as well, with the collusion of the SPAWAR General Counsel who destroyed the pillar SAIC contract in an expansive RICO predicate acts violations.

### B.     Abou-Hussein's Earlier Frame-Up at SPAWAR Charleston, SC

30.     In September 2005, plaintiff was hired by the Navy Acquisition Career Center ("NACC") program, to which he had applied two years earlier, for graduate professionals complying with the Defense Acquisition Workforce Improvement Act ("DAWIA").  Plaintiff took the job offer by phone in August 2005 so the hiring process -by mail- was extremely fast since SPAWAR asked to conclude all paperwork before funds run out when fiscal year ends on September 30, 2005.

31.     Plaintiff's SPAWAR position was supposedly for managing technical installations on Navy ships, had nothing at all to do with ground armored vehicles, and plaintiff had no knowledge at all that SPAWAR is the main integrator of counter-IED systems.

32.     Joint Personnel Adjudication System ("JPAS") is an electronic database of security clearance adjudications, which confirmed to SPAWAR that plaintiff has prior recent favorable secret clearance adjudication while with his prior employer, NGC, and thus the security requirements for joining the civil service were met.  Plaintiff was issued his SPAWAR ID badge on this first day in government, September 19, 2005.

33.     In October 2005, plaintiff filed EEO complaint against SPAWAR security director, who had refused to issue plaintiff a Common Access Card ("CAC") or have an email account.  Plaintiff offered to drop the complaint when SPAWAR Charleston Commanding Officer ("CO") guarantees that his security clearance will not be revoked.

34.     In November 2005, plaintiff made formal his Equal Employment Opportunity Commission ("EEOC") complaint against SPAWAR security director, who responded to the EEOC formal complaint by filing a security report to NCIS that plaintiff is a sleeper spy collecting information on armored vehicles and the roadside bombs' jamming systems being installed inside SPAWAR facilities.

9

35. On February 28, 2007, after a 16 months litigation ordeal, EEOC held a hearing at SPAWAR Charleston, and plaintiff agreed to settle under duress of further allegations of espionage and his own attorney threatened to walk out on him. The local sole practitioner representing plaintiff at EEOC hearing was retained by the local armored vehicles manufacturer, Protected Vehicles Incorporated ("PVI"), to handle its bankruptcy restructuring after it was handed $15M from DON in progress pay on the same EEOC hearing day. Plaintiff believes this is the same RICO bribery tactic that caused him to fire his Qui Tam attorney 4 years later for a breach of trust, and thus Qui Tam action was dismissed since he cannot proceed pro se in the shoes of the United States.

36. The EEOC Administrative Law Judge ("ALJ"), Honorable Davi, saved plaintiff when ALJ proposed the core clause of the settlement that waived the DON defense of US Supreme Court precedent in *Navy v. Egan* if plaintiff's security clearance is revoked and to allow him to seek damages. This core clause in the EEOC settlement set the stage for instant dispute since if DON revoked the security clearance of plaintiff it then cannot claim an unjusticable issue; thus, a RICO has to send this plaintiff to prison, humiliate him to resign, or scare him enough to run for his life.

37. This EEOC settlement core clause caused defendant's subordinates, when whistleblowing over contract fraud began, to attempt to force plaintiff to resign by humiliating him at work and by death threats, criminally frame him up again with false espionage and terrorism allegations despite the DON earlier apology, or have him sent to combat zones for rendition overseas, all were attempted since the execution of the EEOC settlement on March 1st 2007, and are the gravemen of this lawsuit.

      **C.**    **Plaintiff Subjected to Discriminatory Treatment after Settlement**

38. Plaintiff's employer, SPAWAR, does not have funding of its own, but rather acts as a fast contract shop relying on work orders from other government agencies, then awards these orders to defense contractors. SPAWAR acts as the conduit from those government customers with funding of

10

their own but without the contracting authority to steer the awards. The public does not know about the secretive organization or how it turned into a fraud clearinghouse funneling over $7B/year in mostly cyber warfare services, where there is no tangible product to be viewed by the eye in exchange for the monies paid; our nation is in grave danger from this corruption as it takes an aggressive posture in cyber warfare abroad, and plaintiff, a full-blooded American, told the emperor he is naked.

39. March 2007, immediately after the settlement of March 1st 2007, plaintiff was targeted with a plot to eventually destroy him with a sexual harassment allegation; plaintiff requested from his immediate supervisor, Army Intel reserve officer, Ryan Gunst, an immediate investigation into the sexual allegation, but his request was ignored, and plaintiff understood the clan is compiling false evidence for the moment to finish him off. Plaintiff is the only whistleblower in the history of the tight ship organization as admitted by the head of the human resources on the stand at the Board hearing.

40. Plaintiff, who still has a year of wait for the FBI TS clearance and FBI employment, began to piece the puzzle together of how the RICO employing him functions, and his collecting financial and contracting information did not go unnoticed by the conspirators, who humiliated him unceasingly with busy work, refused to fund his training, tried to have him shipped to combat zones for a year deployment away from Habeas Corpus, and snide remarks behind his back.

41. Plaintiff finally came upon concrete evidence of wrongdoing on July 18, 2007, when he heard a NPR radio interview conducted from Israel with a retired Marine Colonel who was introduced as a consultant on wargames, and has the common name, Gary Anderson. Plaintiff had paperwork of a wargame task he is slated to review its technical reports when generated by SAIC in its portal, and that wargame task was not in Charleston but offsite in Quantico, VA. That paperwork listed a Computer Scientist also named Gary Anderson, supposedly working on this same July day on wargame simulation in the computer lab in Quantico, and even though it was a long shot in a very common name, plaintiff began online search to track Mr. Anderson's bio.

11

42. Anderson turned out to be the retired military chief of staff of the same lab in Quantico Marine Corp base, and both Andersons are the same, except the real one does not have any computer science degree but collects -thru SAIC- the highest salary of a senior computer specialist with a Ph.D; moreover, he was not even in the Quantico lab where the work is supposedly being done, but working another job overseas while SAIC is charging his hours. SAIC was recently caught in a similar scheme by NYC Mayor Bloomberg, and paid back the city $500M in fines.

44. Plaintiff suspected in 2007 that the SAIC scheme is widespread, and emailed the Contracting Officer ("KO") Linda Baker on August 3, 2007, telling her to remove his name from this paperwork since he did not negotiate this award, but his name was listed as Originator. Within an hour, Abou-Hussein's email to KO reached the official, Ryan Gunst, reserve Intel Officer, who actually originates the awards then places other engineers' names as originators. Gunst retaliated with more spy allegations in the workplace that even the veneer of civility was eroding, and Abou-Hussein feared not to make it to the FBI TS adjudication to be safe.

45. In desperation from the untenable security situation when Intelligence officers are targeting him by stacking up witnesses, Abou-Hussein made his hail Mary pass to the United States Central Command ("CENTCOM") top brass in Tampa, Fl, who were managing the surge in Iraq in summer of 2007, and were using black ops tactics and amnesty schemes similar to the ones proposed by plaintiff in his 2005 Iraq deployment. Plaintiff achieved this with his Op-Ed published in the Tampa Tribune on august 8, 2007, titled "*A head count could bring peace to Iraq*", after traveling to Tampa and explaining his dilemma to the Newspaper Editor so the Tribune would publish the piece. The subtle piece mentioned only the third prong of the proposal that was missing from the surge, the economic census, and it got the top-brass' attention immediately. SPAWAR CO temporarily stopped all actions

12

against plaintiff, who asked CO by email on September 4, 2007, for an appointment to share his fraud findings and discuss his security situation.

46.     Plaintiff was told he would not meet with CO by his second level supervisor, Terry Simpson, an ex-NSA official and now a Defense Intelligence Senior Leader ("DISL"), who knew of the treatment suffered by plaintiff.  Plaintiff instead met with Simpson, but did not know then that Simpson is the official responsible for the award of the pillar SAIC contract under which the no-bid wargame project was awarded.  Moreover, plaintiff was not then-aware that SAIC Senior Vice President, Harold Dobbs, had personally reached out to Simpson to have this exact wargame project approved.

47.     Simpson assured plaintiff he will take care of his fraud disclosure, and then tried to transfer Abou-Hussein to the Armored Vehicles integration facility, where the workers were openly hostile.  SPAWAR Charleston then arranged for Abou-Hussein to be rotated for three months to SPAWAR San Diego away from the fraud he was probing, and he left to San Diego in December 2007.

### D.     Plaintiff Spy Retaliation Follows Him to San Diego

48.     Abou-Hussein had 2 normal first weeks in San Diego, and was invited to a Christmas party in his supervisor's home, the only time any one from work has invited him home.  However, the word caught up that he is a sleeper spy, and SPAWAR San Diego security officer contacted him.

50.     In San Diego, plaintiff discovered a major piece of the fraud puzzle when he finally learned who is behind the subcontractor Sentek he was tracking in Charleston: RADM Hamlin "Ham" Talent, who had passed his command work to Simpson when the two were in Europe together in 2005, then Simpson would pass the same funded work to RADM Talent immediately upon his retirement and joining Sentek in San Diego, and use SAIC as the prime contractor.  Plaintiff, feeling more confident then, emailed SPAWAR Charleston officials requesting an investigation and a stop payment to SAIC on the wargmae project on February 28, 2008.  Within 3 days, Simpson unlawfully raised plaintiff clearance requirement to TS/SCI., and began steps through security, Navy JAG, and NCIS to disqualify plaintiff from federal service.

### E.     Plaintiff Reach Out to Congress For Redress from the Spy Frame-up

51.     Abou-Hussein needed another hail Mary to survive the conspiracy intended to bypass the terms of the EEOC settlement, so he flew back from San Diego to Charleston, SC, on March 7, 2008, and immediately drove to Washington DC, where he hand-carried an appeal for redress to all members of the Senate and House Armed Services Committees ("HASC").    Abou-Hussein was lucky to get the support of Honorable Ike Skelton, HASC Chairman, and the RICO conspirators at SPAWAR backed off after HASC contacted the Navy's Congressional Staff on March 12, 2008.

52.     Abou-Hussein also received support from his US Senator when he attended Boston University, Honorable Ted Kennedy, who contacted US Senator Graham of South Carolina, who in turn contacted Navy Judge Advocate General ("JAG") Corp. regarding the earlier espionage record of Abou-Hussein.   Navy JAG responded to Honorable Graham that the 2005 spy record can never be expunged.

53.     Abou-Hussein's biggest fear was not the 2005 spy record that Navy JAG refused to expunge because he already has an apology from SECNAV for making this 2005 false record, but feared the still to be compiled perjured testimonies awaiting in Charleston by the members of the RICO clan in punishment for his whistleblowing activities.   Abou-Hussein left the Congressional offices and walked over to the office of the clerk of this honorable court to seek the protection of the law not the men.

54.     On May 5, 2008, Abou-Hussein sued SECDEF Gates in this court seeking to expunge the 2005 record and a declaratory relief only, and kept his pro se action going all the way to the US Supreme Court, 10-739.  Plaintiff reasoned that open litigation has the side benefit to slow more spy records from being created since all prospective perjury witnesses will know of the pending PA/FOIA action, and their promotion in exchange for "confidential source" perjury may not pass the cost/benefit analysis in their minds.  One glaring mistake in this rational is that the RICO conspirators can always raise up the benefits to the eventual witnesses, who were promoted to Engineering Division Directors,

14

though they have no engineering or science degrees, namely Ryan Gunst and Brian Ratliff.

55.     Abou-Hussein withstood a horrendous assault for years since his May 2008 filing of the OSC Fraud Disclosure concurrent with his filing in this court, by intimidating death threats, humiliation, discrimination, and a conspiracy that needs a much longer complaint to detail, and thus he references paragraphs 6-13, 25-29, of this complaint for partial detail of what transpired, and below is a very short synopsis of his major actions since 2008:

   i.   Plaintiff's Commander/IG Complaint of SAIC/Sentek subcontract fraud on November 17, 2008, then NCIS agents opened their criminal investigation, of the complainant Abou-Hussein, same day.

   ii.  Plaintiff's FOIA requests for SAIC and Sentek contracts starting November 2008. SPAWAR counsel office that reports to Brennan then destroyed the 22 first pages of SAIC contract in a RICO predicate act, 18 U.S.C. §2071, then transmitted the forgery of page 79 by email in December 2008 to multiple parties in another RICO predicate crime.

   iii. Plaintiff's FOIA appeal to Navy GC, Brennan, was on March 4, 2009, and "confidential sources" came forward March-April 2009 with under oath testimony of Abou-Hussein's terrorist connections and substance abuse.  One such source, Ryan Gunst, signed his sworn testimony to IG saying he knows nothing about the wargame project (Gunst is the originator of the wargame project), then the very next day the SPAWAR counsel who destroyed SAIC contract arranged for Gunst to testify against Abou-Hussein, in a yet another predicate crime.

   iv.  March 2009, Abou-Hussein reached out to US Senator, Clair McCaskill, Chairman of the Senate ad hoc Committee on Federal Contracting, with his fraud disclosure.

15

    Hon. McCaskill's staffer, Mark Daniels, made an inquiry to Brennan's office, who informed Mr. Daniels they only opened an ethical investigation into Abou-Hussein's allegations, and immediately SPAWAR Charleston had a shake up and its top civilian, Phil Charles, was fired in April 2009.

v. March-April 2009, NCIS agent, Troy Williams, and other unknown NCIS agents, coordinated by email with SPAWAR auditor, Glenda Algozini, who was stalling investigation of Abou-Hussein complaint against SAIC/Sentek.  The colluding resident NCIS wrote up Abou-Hussein for potential terrorist shooting attack before Abou-Hussein told NCIS of his FBI affiliation.  NCIS SPAWAR resident agent Troy Williams committed several predicate acts too numerous to list.

vi. May-June 2009, Abou-Hussein contacted defendant directly thru defendant's legal assistant, USN Captain Gary Sharp, who in turn contacted Brennan, and immediately plaintiff was warned by SPAWAR to cease contact with defendant.

vii.  July 2009, Abou-Hussein filed two actions concurrently in South Carolina District Court, first was a Qui Tam against SAIC/Sentek/SPAWAR, and the second FOIA action to release SAIC contracts, *Abou-Hussein v. Mabus*, 09-cv-1988, which inadvertently produced an original precedent when the government for the very first time litigated under FOIA to withhold unit prices and subcontractor identities.  To highlight the discriminatory religious aspect to the animus, SPAWAR used a sentence from King James Bible in its FOIA filing in district court citing *Armageddon* where Mabus is killed by the Antichrist, this implying who would the muslim Abou-Hussein be if the defendant's name is Mabus.

viii. On August 7, 2009, Abou-Hussein filed directly a fraud complaint with DOD IG, which was referred to Investigation of Senior Officials ("ISO") Unit. DOD IG declined to investigate any Senior Officials and delegated complaint down to SPAWAR IG. SPAWAR security director then rounded all employees around plaintiff and coached them all testify plaintiff is showing signs of mental disorder.

ix. On August 24, 2009, the FCA suit seal leaked when Abou-Hussein faced Algozzini and SPAWAR Counsel, Gail Silverman, inside USA office in downtown Charleston, and on the same day, a frantic rounds of meetings of the entire SPAWAR leadership convened. On the same day, in yet another predicate act, Michael Roys, who was representing DON in MSPB litigation against Abou-Hussein, began drafting the letter to suspend him for having a violent mental disorder. Two days later, August 26, 2009, plaintiff was removed by the Anti-terrorism officer from his desk and referred to the Navy's mental clinic. Algozzini falsified a fraud report on the USA meeting day, August 24, by backdating it to August 5, 2009, to precede the DOD IG hotline complaint, and then transmitted the falsified report to DOD IG by email, in yet another predicate act.

x. On April 6, 2010, in the course of his MSPB litigation, Abou-Hussein video deposed Algozzini for hours, until Algozzini cracked and admitted wrongdoing in that SAIC overcharged the government (page 158 of the court reporter's transcript.) Algozzini has since retired after Abou-Hussein filed yet another Navy IG complaint citing the video deposition, but the IG replacement who was brought from retirement, John Gamble, was also one of the conspirators of November 17, 2008, the day NCIS almost detained plaintiff Extra-Judicially.

SPAWAR acts as a façade for the likes of SAIC, and thus acts as conduit from those government customers who were not allowed the contracting authority to steer the awards to their cronies. Plaintiff has the paper trail of such customers coming over requesting to use a certain contractor specifically for their alleged project, where said customers will surely accept the deliverables from a project supposedly managed by SPAWAR. The public does not know a thing of that inverted GSA scheme, or how it turned into a fraud clearinghouse; however, an Order from this court to OIP to publish on its FOIA policy instructions web page that DOJ violated its own FOIA policy based on the precedent in *Acumenics* and AG Holder's FOIA memorandums will open the public's eye. Plaintiff pleads with USA not to defend instant case.

## FIRST CLAIM

56. The Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 55 as if fully set forth herein.

57. The conduct and actions of the defendant as described above against the plaintiff was based on his Arabic national origin, was done intentionally, maliciously and/or with a reckless disregard for the natural and probable consequences of its acts, was done without lawful justification and was designed to and did cause specific and serious injury, mental pain and suffering, in violation of the Plaintiff's rights under 42 U.S.C. §2000e et seq.

## SECOND CLAIM

58. The Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 57 as if fully set forth herein.

59. The conduct and actions of the defendant as described above against the plaintiff was based on his whistleblowing activity, was done intentionally, maliciously and/or with a reckless

disregard for the natural and probable consequences of its acts, was done without lawful justification and was designed to and did cause specific and serious injury, including mental pain and suffering, in violation of the Plaintiff's rights under WPA, and 18 U.S.C. § 1513.

### THIRD CLAIM

60.     The plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 59 as if fully set forth herein.

61.     The conduct and actions of the defendant as described above in subjecting the plaintiff to discrimination based on his attempt to stop one False Claim or more on the United States, with his piecing of the puzzle with FOIA requests then filing his Qui Tam action, was done intentionally, maliciously and/or with a reckless disregard for the natural and probable consequences of its acts, was done without lawful justification and was done in retaliation for the plaintiff having complained about discriminatory treatment, and was designed to and did cause specific and serious injury, including mental pain and suffering, in violation of the Plaintiff's rights under the retaliation provisions of the FCA.

**WHEREFORE**, the plaintiff demands the following relief jointly and severally against the defendant:

A.     Compensatory damages for the plaintiff in an amount to be determined by the jury or the finder of fact, including, but not limited to, back pay, front pay, lost pension benefits and retirement benefits, and the value of other lost benefits, mental anguish, pain and suffering, embarrassment and humiliation;

B.     Punitive damages in an amount to be determined;

C.     The convening and impaneling of a jury to consider the merits of the claims herein;

D.     All costs of this action;

E.	Order to DOJ OIP to publish on OIP website that DOJ has already litigated the *Fundamental Question* in South Carolina District Court in a FOIA lawsuit also captioned <u>*Abou-Hussein v, Mabus*</u>, 2:09-cv-01988, and to cite to the following Jurisprudence of Honorable Merrick Garland: "<u>We have never decided that **Fundamental Question**, however, because the government has never litigated whether such prices are subject to those statutes</u>", <u>*McDonnell Douglas Corp. v. USAF*</u>, 375 F. 3d 1182, C.A.D.C., 2004.

F.	Such other and further relief as this court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

DATED:	June 5, 2012

Respectfully Submitted,


/s/ Alex Abou-Hussein
Alex Abou-Hussein
P.O. Box 40551
N. Charleston, SC 29423
Tel.: (251) 648-9632